2012 VT 27

# John (Jack) O'Connor v. Thomas J. Donovan, Jr.

[48 A.3d 584]

No. 11-033

Present: Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Morse, J. (Ret.), Specially Assigned

Opinion Filed April 13, 2012

414

*Kaveh S. Shahi* of *Cleary Shahi & Aicher, P.C.*, Rutland, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, and *Mark J. Di Stefano*, Assistant Attorney General, Montpelier, for Defendant-Appellee.

¶ 1. **Burgess, J.** The principal question presented by this appeal is whether, and to what extent, a state's attorney who serves as a county's chief law enforcement officer is entitled to official immunity from civil liability for allegedly tortious conduct concerning a local police officer. The trial court concluded that liability for the acts complained of was precluded by either qualified or absolute immunity, or was otherwise barred. We conclude that the State's Attorney was entitled to absolute immunity, and therefore affirm.

¶ 2. This case commenced in February 2010 when plaintiff, then employed as a police officer with the South Burlington Police Department, filed a complaint against defendant, the Chittenden County State's Attorney, stating claims for defamation, intentional infliction of emotional distress, and intentional interference with plaintiff's employment. The complaint alleged that defendant, formerly a private lawyer and a member of what plaintiff characterized as the Vermont "Drug Bar" representing criminal defendants, harbored an animus against plaintiff due to his police work. Plaintiff claimed that as state's attorney defendant had "maliciously pursued a course of action . . . to undermine plaintiff's work and credibility in the law enforcement community." As alleged in the complaint and in plaintiff's later responses to discovery, defendant's tortious misconduct included meeting with plaintiff's supervisors to criticize his job performance and falsely accuse him of dishonesty; declining to file charges or seek search warrants based on plaintiff's affidavits; threatening not to work with plaintiff and thereby end his career if plaintiff attempted to bypass the state's attorney's office and obtain warrants directly from the trial court; criticizing plaintiff's work when he was being considered by the State Police to serve on its Drug Task Force; impugning plaintiff's honesty to other prosecutors; encouraging the filing of a civil-rights lawsuit against plaintiff and testifying falsely in that action; and "leaking" harmful information about plaintiff to criminal defense attorneys.

¶ 3. Defendant answered the complaint, raising the affirmative defense of official immunity. Following a status conference, the trial court issued a scheduling order limiting discovery to the immunity issue conditioned on defendant's prompt filing of a motion for summary judgment. Several months later, defendant filed a motion for summary judgment, together with a detailed statement of undisputed facts and supporting documents. Plaintiff

opposed the motion and filed a separate statement of undisputed facts.

¶ 4. The trial court issued a written ruling in December 2010. Initially, the court noted that plaintiff's statement of undisputed facts failed to contain "specific citations to the record," with the result that many of the facts set forth by defendant were "deemed to be admitted." V.R.C.P. 56(c)(2). The court then considered each of the specific acts complained of, concluding that they were all barred by either absolute or qualified immunity, privileged, or insufficient to state a claim.[1] Accordingly, the trial court entered judgment in favor of defendant. This appeal followed.

¶ 5. Plaintiff contends the trial court erred in concluding that defendant was entitled to qualified or absolute immunity for the bulk of the acts alleged. While not required to cross-appeal from the judgment in his favor, defendant also contends the court erred. See *Staruski v. Cont'l Tel. Co.*, 154 Vt. 568, 571 n.3, 581 A.2d 266, 267 n.3 (1990) (party content with final order need not file cross-appeal to preserve claim for review because it "had nothing in the first instance to appeal"). Defendant claims that the court erroneously rejected his argument that he was entitled to absolute immunity as the highest law enforcement officer in the county.

¶ 6. An assessment of the claims requires close scrutiny of the decisional law governing official immunity. Our analytic starting point is *Libercent v. Aldrich*, 149 Vt. 76, 539 A.2d 981 (1987), where we expressly recognized "two degrees of official immunity," explaining: "Absolute immunity is generally afforded to judges . . . legislators, and the highest executive officers, where the acts complained of are performed within their respective authorities. Only qualified immunity is extended to lower level officers, employees, and agents." *Id.* at 81, 539 A.2d at 984. The latter form of immunity is qualified in the sense that it requires several elements, including a showing that the government officials were "1) acting during the course of their employment and . . . within the scope of their authority; 2) acting in good faith; and 3)

---

[1] The court divided plaintiff's factual allegations into two categories, undisputed and disputed, assumed the latter to be true, and dealt with them as though defendant's motion for summary judgment was a motion to dismiss.

performing discretionary, as opposed to ministerial acts." *Id.* (quotation omitted).[2]

¶ 7. The rationale for separate standards applicable to executive officials was cogently summarized by Justice Harlan some years earlier, as follows:

> To be sure, the occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted . . . which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity.

*Barr v. Matteo*, 360 U.S. 564, 573-74 (1959); see also *Scheuer v. Rhodes*, 416 U.S. 232, 246-47 (1974) (recognizing that "higher

---

[2] As we later explained, when protected by absolute immunity an official's malicious motive or intent is "irrelevant, since a good-faith test is imposed only when qualified immunity is available." *Levinsky v. Diamond*, 151 Vt. 178, 193-94, 559 A.2d 1073, 1084 (1989); see also *Muzzy v. State*, 155 Vt. 279, 281, 583 A.2d 82, 83 (1990) (observing that when prosecutor performs acts within scope of absolute immunity "his motive for acting is not subject to inquiry in a private suit even if there is a claim of willful or malicious conduct" (quotation and citation omitted)). The level of immunity to be applied thus has significant procedural implications. As the U.S. Supreme Court has observed: "An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity. The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial." *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976). Although the high court has since held that an official's "good faith" is to be determined by an objective test predicated on whether the conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), accord *Sabia v. Neville*, 165 Vt. 515, 521, 687 A.2d 469, 473 (1996), the elements of qualified immunity may nevertheless present fact questions that preclude dismissal or summary judgment. See, e.g., *LaShay v. Dep't of Soc. & Rehab. Servs.*, 160 Vt. 60, 64-67, 625 A.2d 224, 227-28 (1993) (affirming summary judgment for Commissioner on basis of absolute immunity as Department's "highest executive officer" but reversing as to social worker and remanding for factual determination as to whether worker violated clearly established right and whether duty was discretionary or ministerial).

officers of the executive branch" may require greater protection "since the range of decisions and choices — whether the formulation of policy, of legislation, of budgets, or of day-to-day decisions — is virtually infinite" and therefore the range of protected discretion "must be comparably broad"), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984); *Spalding v. Vilas*, 161 U.S. 483, 498 (1896) (observing that the same considerations of public policy that immunize judges from civil liability apply to "heads of Executive Departments when engaged in the discharge of duties imposed upon them by law").

¶ 8. Two years after *Libercent*, we addressed the official-immunity doctrine again in *Levinsky v. Diamond*, 151 Vt. 178, 559 A.2d 1073 (1989), a case that remains in many respects the most comprehensive ruling of this Court on the subject. The plaintiff, who owned several Vermont nursing homes, claimed that the defendants — the Vermont Attorney General, deputy attorney general, two assistant attorneys general, and the Commissioner of Social Welfare — committed a series of tortious acts and violated his civil rights during the course of a Medicaid fraud investigation and prosecution. The trial court granted summary judgment for the defendants on the basis of official immunity, and plaintiff appealed.

¶ 9. In reviewing the ruling, the *Levinsky* Court separately analyzed each state and federal claim against each defendant. Dealing with the state claims first, the Court observed that the Attorney General and Commissioner, as the "highest executive officers in their respective governmental units," were entitled to absolute immunity if the acts complained of "were performed within the general authority of those offices." 151 Vt. at 185, 559 A.2d at 1079. The Court looked to the statutory authority of the Attorney General, noting that it was broadly "concurrent with that of the state's attorneys" in criminal matters, and concluded that the acts complained of — the subpoenaing of records, filing of criminal charges, and procuring of a federal fugitive warrant — were all within the Attorney General's broad authority to investigate and prosecute criminal actions and therefore absolutely immune from civil suit. *Id.* at 186-87, 559 A.2d at 1079. As to the calling of press conferences and the statements made therein, the Court concluded that — while not explicitly authorized by statute — they related to the prosecutions in question and therefore fell within the "outer perimeter of the prosecutor's authority and

discretion." *Id.* at 187, 559 A.2d at 1080 (quotation omitted). Finally, as to the committee testimony, the Court concluded that "it was undoubtedly within the attorney general's authority to testify . . . as to a matter closely connected to the funding of a new branch of his office, i.e., the proposed Medicaid Fraud Unit," and thus absolutely immune. *Id.* The Court reached a similar conclusion with respect to the state law claims against the Commissioner, finding that all of the acts complained of were within the scope of his general authority as the highest executive officer for his Department and therefore absolutely immune from civil suit. *Id.* at 188, 559 A.2d at 1081.

¶ 10. Turning to the state claims against the deputy and assistant attorneys general, which largely tracked those against their superior, the Court found that all of the acts complained of were within the scope of their authority. All were performed in good faith, i.e., they did not violate clearly established rights of which a reasonable person would have known, and all were discretionary. *Id.* at 189-92, 559 A.2d at 1081-83. Accordingly, the Court concluded that the elements for qualified immunity were satisfied.

¶ 11. The Court next addressed the plaintiff's federal claims, observing that "[a] *different analysis altogether* must be used in reviewing whether various defendants are shielded by immunity doctrines from plaintiff's charges of civil rights violations under 42 U.S.C. § 1983, since our state immunity doctrine as set forth in *Libercent* differs from that employed in examining federal constitutional claims." *Id.* at 192, 559 A.2d 1083 (emphasis added). In this regard, the Court noted that absolute immunity in § 1983 actions "is not available to all 'high officials,' as it is under Vermont common law." *Id.* at 193, 559 A.2d at 1083. Instead, the federal courts have developed a "functional analysis" derived from common law principles of legislative and judicial immunity in existence when the Civil Rights Act was enacted in 1871. *Id.* at 193, 559 A.2d at 1084 (citing *Imbler*, 424 U.S. at 422-23, 430); see *Kalina v. Fletcher*, 522 U.S. 118, 123, 124 n.11 (1997) (explaining that Congress intended Civil Rights Act of 1871 "to be construed in the light of common-law [immunity] principles that were well settled at the time of its enactment," principally "the firmly established common-law rules providing absolute immunity for judges and jurors"); *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (explaining that, "[i]n determining whether particular ac-

tions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, we have applied a functional approach which looks to the nature of the function performed, not the identity of the actor who performed it" (citation and quotations omitted)). Under this approach, prosecutors are protected by absolute immunity for quasi-judicial acts, which the Supreme Court has defined as those "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430; this is to be distinguished from those functions that "cast him in the role of an administrator or investigative officer rather than that of an advocate" for which only qualified immunity is warranted. *Id.* at 430-31.

¶ 12. Applying the federal standard, *Levinsky* concluded that the prosecutor defendants were all protected by absolute immunity for their actions "in filing the . . . charges" as well as for the allegedly unlawful subpoenaing of records, which "involved an activity legally sanctioned as part of the investigative process, a process necessary to the effective operation of the prosecutors' office." 151 Vt. at 193-94, 559 A.2d at 1083-84. The press conference and the committee appearances were not so "intimately associated" with the litigation process as to warrant absolute immunity, but the Court nevertheless concluded that they met the test for qualified immunity. *Id.* at 194, 559 A.2d at 1084.

¶ 13. As for the Commissioner, *Levinsky* noted that he was "neither a judge, legislator nor prosecutor" entitled to absolute immunity under federal law. *Id.* Instead, under a line of U.S. Supreme Court decisions dealing with the liability of executive officers for civil rights and constitutional violations, *Levinsky* concluded that he was "entitled only to qualified immunity," a standard nevertheless satisfied on the record evidence. *Id.*; see *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (observing that "[f]or executive officials in general . . . qualified immunity represents the norm" in § 1983 actions); *Butz v. Economou*, 438 U.S. 478, 508 (1978) (explaining that "a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations"); *Scheuer*, 416 U.S. at 247-48 (holding that governor and aides sued under Civil Rights Act could receive adequate protection from liability through qualified immunity).

¶ 14. The principles articulated in *Libercent* and *Levinsky* have since been applied many times in many different settings. Before

turning to their progeny, however, it is useful to pause briefly to consider their antecedents. *Libercent* relied principally on a then-recent Michigan Supreme Court decision, *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 667 (Mich. 1984), which explained — in the context of multiple state tort claims against a variety of state officials — that "[a]bsolute immunity from tort liability is granted to judges, legislators, and the highest executive officials of all levels of government, even for malicious acts, as long as they are acting within their respective judicial, legislative, and executive authority." Michigan subsequently codified the *Ross* standard, see Mich. Comp. Laws Ann. § 691.1407(5), and Michigan courts have since accorded the absolute immunity for "high executive officers" to both the state attorney general and the various county prosecutors. See *Am. Transmissions, Inc. v. Attorney Gen.*, 560 N.W.2d 50, 54 (Mich. 1997) (holding that Michigan Attorney General was absolutely immune from defamation action arising from "sting operation" to investigate auto repair shops where his allegedly defamatory statements in television interview related to investigation and therefore fell within the scope of his general authority); *Bischoff v. Calhoun Cnty. Prosecutor*, 434 N.W.2d 249, 251 (Mich. Ct. App. 1988) (reasoning that county prosecutors, as "the chief law enforcement officer of the county," are "accorded absolute immunity so long as they are acting within the scope of their executive authority").

¶ 15. *Levinsky* relied not only on *Libercent* and *Ross*, but delved deeper, citing earlier Vermont decisions recognizing common law judicial immunity, *Banister v. Wakeman*, 64 Vt. 203, 207, 23 A. 585, 586 (1891), and prosecutorial immunity, *Polidor v. Mahady*, 130 Vt. 173, 175, 287 A.2d 841, 843 (1972). The *Polidor* Court relied in turn on *Nadeau v. Marchessault*, 112 Vt. 309, 310, 24 A.2d 352, 353 (1942), a tort action by an indigent plaintiff against the "overseer of the poor" for the City of St. Albans for negligently failing to provide food, shelter, and other assistance. *Nadeau* held that the overseer's duty was "not ministerial but judicial in nature" because it involved "the exercise of judgment and discretion," and concluded that he was therefore absolutely immune from liability for "acts within the limits of his authority." *Id.* at 311, 24 A.2d at 354. Relying on this characterization of discretionary acts as "judicial," *Polidor* later held that the issuance of criminal process by a state's attorney "involves the exercise of that judgment and discretion . . . characterized as

judicial" in *Nadeau*, and that he was absolutely immune from civil suit. 130 Vt. at 175, 287 A.2d at 843.

¶ 16. From this extended history two points emerge. First, like other courts, our early official-immunity decisions in Vermont tended to rely on the longstanding doctrine of judicial-immunity. Although nothing in *Nadeau* or *Polidor* suggests an intent to apply a strict functional analysis on the later federal model, echoes of the doctrine are apparent in the characterization of discretionary-based decisions as "judicial" in nature. Nevertheless, we went to considerable lengths in *Levinsky* to distinguish Vermont common-law immunity applicable to state law claims from the federal immunity doctrine applicable to § 1983 claims. The former, as noted, provides absolute immunity for "high executive" officials such as the Attorney General and agency heads for acts committed within the scope of their authority and only qualified immunity for lower level officials; the latter employs a purely functional analysis largely divorced from the status of the official in question.

¶ 17. This understanding becomes relevant in analyzing the official-immunity cases that followed *Levinsky*, particularly the decision in *Muzzy v. State*, 155 Vt. 279, 583 A.2d 82 (1990). The plaintiff there had sued the Rutland County State's Attorney for failing to dismiss a DUI charge pursuant to a plea agreement, although the opinion does not identify the plaintiff's specific claims. The trial court granted summary judgment in favor of the state's attorney, and we affirmed, holding that "acts related to the dismissal or processing of an information, as in the instant case, are within the prosecutorial function and therefore absolutely immune from civil suit." *Id.* at 281, 583 A.2d at 83. In a footnote, the Court observed: *"Polidor* and *Imbler* make it clear that when prosecutors perform quasi-judicial functions, they have the same immunity as judges. Therefore, to the extent that *Levinsky v. Diamond*, in its analysis of official immunity, considers prosecutors acting in their quasi-judicial role as executive rather than judicial officers, it is overruled." *Id.* at 280 n.\*, 583 A.2d at 83 n.\* (citation omitted).

¶ 18. The meaning of the *Muzzy* footnote is not entirely clear. As noted, *Imbler* was a federal § 1983 action, and nothing in *Polidor* suggests that it was specifically adopting or applying the federal standard to state-law claims against state's attorneys.

Moreover, as noted, *Levinsky* carefully parsed the state and federal immunity standards, expressly grounding the Attorney General's state-law immunity on his role as the "highest executive officer" in his agency, for which he was absolutely immune from civil liability for all of the acts within his general authority, including " 'the general supervision of criminal prosecutions.' " 151 Vt. at 186, 559 A.2d at 1079 (quoting 3 V.S.A. § 153). It is unlikely, therefore, that *Muzzy*'s intent was to overrule — in a brief footnote — *Levinsky*'s specific and carefully constructed holding as to the Attorney General. It is more likely that, in purporting to overrule *Levinsky* "to the extent that [it] . . . considers *prosecutors* acting in their quasi-judicial role as executive rather than judicial officers," 155 Vt. at 280 n.*, 583 A.2d at 83 n.* (emphasis added), *Muzzy* was referring only to state's attorneys.[3]

█ ¶ 19. The difficulty with this interpretation, assuming it to be correct, is two-fold. First, there were no state's attorney defendants in *Levinsky*, so the footnote is essentially dictum in the sense that it overrules nothing that was actually at issue there. Second, to the extent that the role of the state's attorney was considered in *Levinsky*, it was as a close analog to the Attorney General. *Levinsky* noted that the Attorney General's statutory authority over criminal prosecutions was "concurrent with that of state's attorneys" and that the two offices shared "at least equal authority to initiate criminal prosecutions" in their respective spheres. *Levinsky*, 151 Vt. at 186, 559 A.2d at 1079 (quotation omitted). Like the Attorney General, the state's attorney is an elected position that represents the state's authority in matters of criminal law enforcement. The state's attorney is empowered to prosecute all offenses "committed within his or her county" and, like the Attorney General, is authorized to employ, direct, and if necessary remove "at pleasure" as many deputies "as necessary for the proper and efficient performance of his or her office" as well as to hire, direct, and remove "at will" an investigator to perform "tasks related to the state's attorney's office." 24 V.S.A. §§ 361(a), 363, 364(a).

---

[3] This was how the trial court here interpreted *Muzzy*, observing that although "[i]t is not entirely clear what the Court meant by that brief comment . . . it was apparently intended to reject the distinction between state and federal claims" as to county prosecutors, so that any claim to absolute immunity depended on the nature of the function performed rather than whether it was generally "within the scope of their authority" as a high executive official.

424

¶ 20. Acknowledging the considerable powers of local prosecutors, other states in similar circumstances have accorded them absolute immunity from state-law claims for all actions within the scope of their authority. In *Foster v. Pearcy*, 387 N.E.2d 446 (Ind. 1979), for example, the Indiana Supreme Court rejected the plaintiff's attempt to distinguish the State Attorney General from local district attorneys for immunity purposes, explaining: "We do not accept this distinction. Both the Attorney General of Indiana and the local prosecuting attorneys in this State exercise certain sovereign powers. It would be anomalous indeed to hold that the attorney general enjoys an absolute privilege, while the local prosecuting attorneys have only a conditional privilege for the same conduct." *Id.* at 449. The Indiana court thus held that a district attorney's absolute immunity was not "limited to . . . cases where the prosecutor is acting only as the State's advocate," as under *Imbler*, but extended more broadly to statements made to the press regarding pending cases and the hiring and supervision of deputies. *Id.* at 448. Other states are in accord. See, e.g., *Bischoff*, 434 N.W.2d at 251 (holding that Michigan county prosecutor was covered by rule affording absolute immunity to "highest . . . executive officials" acting within the scope of their authority); *Pickering v. Sacavage*, 642 A.2d 555, 558-59 (Pa. Commw. Ct. 1994) (noting that the "position of district attorney is an elected office with considerable and important policy-making functions" and therefore defendant district attorney was entitled to absolute immunity afforded "high public officials" for allegedly defamatory statements at press conference on matters relating to criminal investigation).

¶ 21. In light of the considerable statutory and constitutional powers accorded Vermont's state's attorneys, we find the reasoning of these decisions not only persuasive, but compelling. Thus, we discern no sound basis to deny state's attorneys the same immunity for "high executive officials" that their state counterpart, the Attorney General, enjoys for conduct within the general authority of the office. *Levinsky*, 151 Vt. at 185, 559 A.2d at 1079. To the extent that *Muzzy* suggests otherwise, it is disapproved.[4]

---

[4] Subsequent decisions that may have interpreted *Muzzy* to confine a state's attorney's absolute immunity in state tort actions to those acts closely associated with the litigation process, such as *Huminski v. Lavoie*, 173 Vt. 517, 520-21, 787 A.2d 489, 493 (2001) (mem.), are thus to that extent overruled.

¶ 22. Our holding has no effect of course on the immunity standard governing federal claims. Here, however, we are concerned solely with several state claims, specifically defamation, intentional interference with employment, and intentional infliction of emotional distress. Therefore, we must determine whether the acts complained of fall within the general scope of defendant's authority as Chittenden County State's Attorney, thereby entitling him to absolute immunity from suit.

¶ 23. We conclude that plaintiff's claims are barred under this standard. As the trial court concluded, it was well within defendant's authority as state's attorney to decline to file criminal charges or search-warrant applications based on his dissatisfaction with plaintiff's affidavits. See *Levinsky*, 151 Vt. at 186-87, 559 A.2d at 1079 (holding that prosecutorial decisions to file criminal charges, seek fugitive warrant, and subpoena records in connection with investigation were "within his general scope of authority" and "shielded absolutely from any civil liability"); see also *Burns v. Reed*, 500 U.S. 478, 493 (1991) (holding under federal standard that prosecutor's actions in applying for search warrant were central to prosecutor's role and absolutely immune from civil liability). Indeed, it is well settled under both state and federal immunity standards that a prosecutor's decision *not* to prosecute is entitled to the same absolute immunity from civil suit as the decision to file charges. See *Harrington v. Almy*, 977 F.2d 37, 40 (1st Cir. 1992) ("[T]he interest that prosecutorial immunity is designed to protect — independence in the charging decision — is implicated whether the decision is to initiate a prosecution or decline to do so.").

¶ 24. In *Roe v. City & County of San Francisco*, 109 F.3d 578 (9th Cir. 1997), for example, a state police officer sued the district attorney for damages and injunctive relief after he was reassigned and his duties were restricted based on the district attorney's refusal to file any cases referred by the officer without corroborating evidence. The court held that the district attorney was absolutely immune from suit for the decision not to prosecute for the same policy reasons that protected the decision to charge a defendant, and further observed that this conclusion did not change even where the decision involved a "whole line of cases" based on the prosecutor's judgment concerning the veracity of a police witness. *Id.* at 583. As the court explained, "[j]ust as a

prosecutor's professional evaluation of the evidence assembled by the police is entitled to absolute immunity, a prosecutor's professional evaluation of a witness is entitled to absolute immunity even if that judgment is harsh, unfair or clouded by personal animus." *Id.* at 584 (citation omitted); see also *Botello v. Gammick*, 413 F.3d 971, 977 (9th Cir. 2005) (holding that prosecutors' alleged attempt to have police officer fired through "their decision not to prosecute [his] cases and their communication of that decision is . . . entitled to absolute immunity"); *Harrington*, 977 F.2d at 40 (holding that prosecutor's "refusal to prosecute cases brought by Officer Harrington" was "squarely" within the scope of absolute prosecutorial immunity under federal standard); *Beck v. Phillips*, 685 N.W.2d 637, 644 (Iowa 2004) (holding that county prosecutor sued by police officer for defamation and interference with employment contract was "entitled to absolute immunity for the decision not to prosecute the class of cases in which [the officer] would appear as a witness").

¶ 25. It was equally within defendant's general authority as the chief county law enforcement officer to review plaintiff's job performance; discuss it with other prosecutors in the office, plaintiff's supervisors, and the state police; and take such measures as defendant deemed fit — including declining to work with plaintiff in the future — in the event that plaintiff attempted to circumvent or failed to follow standards and procedures. Supervising the investigative activities of police officers that result in the referral of cases for prosecution and reviewing those matters with other law enforcement personnel must, as a practical matter, fall within the general oversight authority of the state's attorney as the chief law enforcement officer in the county. See, e.g., *Hyatt v. Cnty. of Passaic*, 340 F. App'x 833, 838 (3d Cir. 2009) (holding that county prosecutors were absolutely immune from suit for decisions relating to training of police officers); *Porter v. State*, 432 S.E.2d 629, 632 (Ga. Ct. App. 1993) (noting that district attorney as "chief law enforcement officer of the county" was responsible "to ensure that [police] personnel [were] properly trained and that they follow the law"); *Gerofsky v. Passaic Cnty. Soc'y for Prevention of Cruelty to Animals*, 870 A.2d 704, 711 (N.J. Super. Ct. App. Div. 2005) (observing that county prosecutor is generally considered "the chief law enforcement officer in the county" with "broad supervisory authority over the operations of municipal police departments" (quotation omitted)); see also 24 V.S.A.

§ 361(a) (setting forth state's attorney's general responsibility for prosecution of all offenses within his or her county and "all matters and causes cognizable by the supreme and superior courts in behalf of the state"); *In re Wakefield,* 107 Vt. 180, 189, 177 A. 319 (1935) ("A State's attorney in this State is not merely a prosecuting officer in the county in which he is elected. He is also an officer of the State, in the general matter of the enforcement of the criminal law."). As the court in *Bischoff* observed, a county prosecutor, "as the chief law enforcement officer in the county," is "acting within the scope of his executive authority in acting to ensure that a . . . police officer in his county was a fit person for that job." 434 N.W.2d at 253.

¶ 26. Disclosing nonprivileged information concerning plaintiff's performance as a law enforcement officer also falls within defendant's general authority and responsibility as chief law enforcement officer to ensure the effective and uniform enforcement of the law. See *Levinsky,* 151 Vt. at 187, 559 A.2d at 1079-80 (holding that public statements at press conference relating to matters within scope of Attorney General's authority were absolutely immune from suit). And testifying under subpoena in his capacity as state's attorney was also plainly within the scope of defendant's authority, and therefore absolutely immune from suit. In addition, such testimony was absolutely protected by the so-called testimonial privilege. See Restatement (Second) Torts § 588 (1977) ("A witness is absolutely privileged to publish defamatory matter . . . as a part of a judicial proceeding in which he is testifying . . . ."); see also *Rioux v. Barry,* 927 A.2d 304, 308, 312 (Conn. 2007) (applying general rule that "absolute [testimonial] immunity bars defamation claims that arise from statements made in the course of judicial or quasi-judicial hearings" to bar claim of intentional interference with contractual relations based on statements made in judicial or quasi-judicial proceeding).

¶ 27. Plaintiff's assertion on appeal that patently false and defamatory statements simply cannot enjoy official immunity misapprehends the fundamental balance that underlies the doctrine. As Judge Learned Hand explained: "In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949); see also *Levinsky,* 151 Vt. at 185-87,

559 A.2d at 1079-80 (explaining that Attorney General's statements allegedly defaming plaintiff by falsely accusing him of converting Medicaid payments to his own use were within scope of his general authority and therefore absolutely immune from civil liability). That defendant was allegedly motivated by ill will or a malicious design to interfere with plaintiff's livelihood does not diminish the absolute immunity afforded conduct otherwise within the general scope of defendant's authority. See *Levinsky*, 151 Vt. at 187 n.3, 559 A.2d at 1080 n.3 (observing that, where actions are protected by absolute immunity, a high executive's alleged malicious motive is "irrelevant").

¶ 28. Nor, finally, does the record support plaintiff's claim that the trial court abused its discretion in staying further discovery before ruling on the summary judgment motion. The claim is based on the court's scheduling order, which cited defendant's intention to assert the defense of official immunity, authorized defendant to conduct limited discovery related to that issue, and — in the event that defendant moved for summary judgment based on immunity — provided that plaintiff could request permission "to take specific discovery in order to oppose the defendant's motion" pursuant to Vermont Rule of Civil Procedure 56(f). Defendant thereafter filed a motion for summary judgment asserting official immunity supported, in part, by his affidavit and a number of exhibits. In his opposition to the motion, plaintiff asserted that it was necessary to depose, among others, defendant, a deputy state's attorney, and the attorney who had initiated the earlier-mentioned civil rights lawsuits against plaintiff. The trial court denied this request for additional discovery, noting that plaintiff had filed no affidavit explaining why the depositions were necessary to adduce facts essential to his case, as required by Rule 56(f), and that, in any event, the further discovery appeared to be directed at issues related to defendant's motives and intent that were irrelevant to the claim of immunity.

¶ 29. The trial court's ruling was sound. The official immunity doctrine seeks to spare governmental officials from unnecessary burdens associated with defending lawsuits arising from conduct within the scope of their authority. See *Sabia*, 165 Vt. at 521, 687 A.2d at 473 (observing that official immunity serves to alleviate public officials from "the distraction and expense of defending themselves in the courtroom" for conduct within the scope of their authority). We have thus "encouraged early reso-

ution of immunity claims" when possible, *Cook v. Nelson,* 167 Vt. 505, 513, 712 A.2d 382, 387 (1998), and have recognized that it is often appropriate to resolve the issue pretrial as a matter of law. *Sabia,* 165 Vt. at 521, 687 A.2d at 473. The scheduling order in this case furthered that purpose by requiring a specific showing that additional discovery was necessary to rebut the claim of official immunity. See *Anderson v. Creighton,* 483 U.S. 635, 646 n.6 (1987) (observing that early resolution of official immunity claims serves "to protect public officials from the broad-ranging discovery that can be peculiarly disruptive of effective government" (quotation omitted)). The record supports the trial court's finding that plaintiff failed to make the requisite showing. Accordingly, we find no basis to disturb the judgment.

*Affirmed.*