NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 71

No. 2018-158

| | |
|---|---|
| Antony Sutton, et al. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Lamoille Unit, |
| | Civil Division |
| | |
| Vermont Regional Center, et al. | April Term, 2019 |

Thomas Carlson, J.

Russell D. Barr, Chandler W. Matson and Benjamin E. Novogroski of Barr Law Group, Stowe,
  for Plaintiffs-Appellants.

Thomas J. Donovan, Jr., Attorney General, and Benjamin D. Battles, Solicitor General,
  Montpelier, for Defendants-Appellees.


PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1. **ROBINSON, J.** Plaintiff investors appeal the dismissal of their claims against the Vermont Agency of Commerce and Community Development (ACCD) and current and former state employees arising from the operation of a federally licensed regional center in the United States Customs and Immigration Services (USCIS) EB-5 program. We reverse the dismissal of plaintiffs' claims of negligence and negligent misrepresentation against ACCD, gross negligence against defendants Brent Raymond and James Candido, and breach of contract and the implied covenant of good faith and fair dealing against ACCD. We affirm the dismissal of plaintiffs' remaining claims.

¶ 2.    At this stage in the litigation, we assume for the purpose of evaluating defendants'

motion to dismiss that the allegations in plaintiffs' complaint are true.[1]  Plaintiffs have alleged as

follows.  The employment-based fifth preference visa, or EB-5, program, which is run by USCIS,

is intended to stimulate the U.S. economy and create jobs through capital investment from foreign

investors.  Through this program, foreign investors and their spouses and children can become

eligible for green cards if they make the required investment in a commercial enterprise in the

United States and plan to create at least ten permanent full-time jobs for U.S. workers.  Under the

Immigrant Investor Program, a certain number of EB-5 visas are designated for foreign nationals

who invest $500,000 in commercial enterprises associated with regional centers approved by

USCIS based on proposals promoting economic growth.  There are hundreds if not thousands of

regional centers throughout the United States, and virtually all of them are private ventures.  Some

regional centers provide little more than administrative services such as submitting information to

USCIS for a project and its investors.  Others take a more active role in administration, oversight,

auditing, and consultation to ensure investment projects comply with USCIS EB-5 regulations,

immigration law, and securities laws.

¶ 3.    USCIS designated ACCD as a regional center in 1997, and ACCD began operating

the Vermont Regional Center (VRC).[2]  The VRC held itself out as a regional center that took a

more active role in administration, oversight, auditing, and consultation.  It was not the only state-

affiliated regional center, but it was the only one that represented that it was a "state-run agency."

The VRC billed itself as an attractive option for development and foreign investment due to its

---

[1]  We emphasize that in this opinion we take no position as to the accuracy of plaintiff's allegations.

[2]  The VRC is not a distinct legal entity but, rather, is a moniker for the regional-center program operated by ACCD through its employees.  In describing the actions of ACCD and its employees relating to operation of the regional center, we sometimes refer to the VRC. Plaintiffs have named both ACCD and the VRC as defendants.  For the purposes of our analysis, we do not treat the VRC and ACCD as separate defendants.

superlative "oversight powers," the overwhelming investor confidence that came from its "stamp of approval," and the State of Vermont's backing that would result in a "faster path to approval."

¶ 4. In 2006, the VRC partnered with a series of projects led by Ariel Quiros and William Stenger (referred to as the "Jay Peak Projects"). The phased series of eight proposed projects included building a hotel, indoor water park, ice rink, golf club house, medical center, and other facilities in Jay, Vermont; a biomedical research facility in Newport, Vermont; and a hotel, conference center, aquatic center, tennis center, and mountain bike facility in Burke, Vermont.

¶ 5. ACCD entered into a memorandum of understanding (MOU) with the Jay Peak Projects for each project. Each recited that "ACCD desires to obtain assistance in the planning and management of the Jay Peak EB-5" project "to assure the project's compliance with U.S. immigration law and regulations . . . and, thereby, to have greater assurance of its compliance with regional center requirements." Accordingly, the parties agreed that the Jay Peak Projects would, among other things, "support ACCD's compliance with regional center requirements by providing on a quarterly basis formal written progress reports" which would "set forth for the preceding quarter and year-to-date the number of investors, the status of alien investor capital (in escrow, transfers from escrow to the limited partnership) and activity of the limited partnership in furtherance of the project."[3] These MOUs were included in the offering documents for the Jay Peak Projects. Offering documents were issued to each investor.

¶ 6. Employees of ACCD—including James Candido and Brent Raymond, both former executive directors of the VRC, and John Kessler, general counsel for ACCD—traveled with Jay Peak representatives to EB-5 tradeshows, at which they would share a table and jointly solicit investors and promote the Jay Peak Projects.

---

[3] Because plaintiffs rely on the MOUs in the complaint, we will consider the MOUs in deciding the motion to dismiss. "When the complaint relies upon a document . . . such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." Kaplan v. Morgan Stanley & Co., 2009 VT 78, ¶ 10 n.4, 186 Vt. 605, 987 A.2d 258 (alteration in original) (quotation omitted).

¶ 7. ACCD employees represented to prospective investors, including plaintiffs, that the added protections of state approval and oversight made the Jay Peak Projects a particularly sound investment. They told prospective investors that the VRC conducted quarterly reviews to ensure that projects complied with all applicable laws and regulations and "engag[ed] in the financial monitoring and auditing of projects to ensure legitimacy," and they represented that the MOUs imposed "strict covenants and obligations on the project to ensure compliance with all applicable laws and regulations."

¶ 8. Plaintiffs reasonably relied on these statements by ACCD employees in investing in the Jay Peak Projects.

¶ 9. Unbeknownst to the investors, but known to the VRC officials, no such state oversight by the VRC existed. The VRC never issued any of the quarterly reports contemplated in the MOU. Brent Raymond, in fact, eventually confirmed that the VRC "does not prepare quarterly reports on projects."

¶ 10. Defendants and the Jay Peak Projects worked with a consulting firm that helped solicit potential investors. In early 2012, the firm's owner raised concerns with the VRC that the Jay Peak Projects were illegally misappropriating funds. His attorney requested financial documents for the Jay Peak Projects. The firm's owner held a conference call with VRC employees to discuss potential fraud in the Jay Peak Projects. That February, the firm ended its business dealings with the Jay Peak Projects and announced it had lost confidence in the finances and representations of the Jay Peak Projects and ACCD. The VRC effectively prevented the consulting firm from doing further work in Vermont.

¶ 11. James Candido then conducted an "audit-visit" to the Jay Peak Projects. He reported finding "no issues" with the Projects' financials, but made no record of his findings. He also coordinated with an immigration attorney—who plaintiffs allege had a long-standing referral relationship with the Jay Peak Projects and thus a financial stake in them—to inspect the Projects and issue a report responding to the consulting firm's claims. Plaintiffs allege that the attorney

4

spent "an extravagant weekend" at the Jay Peak Projects, after which he issued a report "painting a glowing picture of a successful EB-5 project" that "highlight[ed] the first-class amenities at the Jay Peak Projects, its high sale figures, and the 'particularly careful' oversight" by the VRC. That report also said that James Candido inspected the Jay Peak Projects' financial records quarterly and that the Projects' records would also be audited by an independent accounting firm.

¶ 12. The VRC, and in particular James Candido, used this report to assure prospective and existing immigrant investors that the consulting firm's concerns about misappropriation of funds within the Jay Peak Projects were unfounded. They said the consulting firm made the allegations because of a "business dispute." James Candido reassured investors that he had investigated the Jay Peak Projects and it was safe to invest in them, and investors accordingly relied on these statements in investing in the Projects. Plaintiffs allege this was an intentional misrepresentation.

¶ 13. At least one other individual also contacted John Kessler and James Candido in 2012 to inform them that the Jay Peak Projects might be committing securities violations and misusing investor funds.

¶ 14. Plaintiffs allege that "the VRC responded not by engaging in . . . audit and oversight" but rather "by stepping up promotion of the Jay Peak Projects," and that Brent Raymond and James Candido "deflected investor complaints."

¶ 15. In 2014, about twenty investors, including plaintiff Antony Sutton, sent complaints to Brent Raymond alleging that the Jay Peak Projects was misappropriating investor funds. They specifically alleged that the Jay Peak Projects had conducted fraudulent sales of penthouse suites, converted their equity interests into an unsecured promissory note, and had not made available any financials showing the source and use of investor funds.

¶ 16. In response, Brent Raymond told the investors that the VRC had no legal authority to conduct financial reviews. In an email to Antony Sutton, he chastised "Mr. Sutton and the Jay Peak Investors for 'how farfetched' their expectations were for the VRC to monitor, oversee, or

5

otherwise review financial documents relating to the Jay Peak Projects." He said the VRC had "not been auditing [the Jay Peak Projects'] financials—nor are we required to, or ever represented that we were." (alteration in plaintiffs' complaint.)

¶ 17.   In early 2015, Brent Raymond and the VRC approved the Jay Peak Projects to solicit investors for additional projects. Plaintiffs allege that one of those projects, a proposed biomedical research facility, was a "total fraud."

¶ 18.   In April 2016, the U.S. Securities and Exchange Commission filed a lawsuit alleging securities fraud, wire fraud, and mail fraud against the Jay Peak Projects developers, Ariel Quiros and William Stenger. The Vermont Department of Financial Regulation also filed suit against Quiros and Stenger, alleging similar claims.[4]

¶ 19.   On the basis of these and other allegations, plaintiffs, all foreign nationals who invested in the Jay Peak Projects, filed a multi-count claim against ACCD and several individual defendants. The trial court granted plaintiffs' motion to amend their complaint for a third time to a Fourth Amended Complaint, and then dismissed all thirteen counts on various grounds. Plaintiffs appealed.

¶ 20.   We review a trial court's decision on a motion to dismiss without deference, using the same standard as the trial court. In determining whether a complaint can survive a motion to dismiss under Vermont Rule of Civil Procedure 12(b)(6), we bear in mind that Vermont Rule of Civil Procedure 8(a) simply requires that a complaint present "a short and plain statement of the claim showing that the pleader is entitled to relief." We assume that the facts pleaded in the

_____

[4] Plaintiffs submitted a July 3, 2018 Notice of Termination from USCIS sent to ACCD as an appendix to their briefing. Defendants requested that, "to the extent the Court considers the July 3, 2018 Notice of Termination from the United States Citizenship and Immigration Services (USCIS) terminating the Vermont Regional Center's status under the Immigrant Investor Program, the Court also take judicial notice of the State's appeal of the Notice of Termination." We do not consider the July 3, 2018 Notice of Termination because it is outside the record on appeal. V.R.A.P. 10(a). See also In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc., 169 Vt. 82, 89, 725 A.2d 927, 933 (1999) (documents not filed with trial court are not part of record on appeal). As the Court is not considering the Notice of Termination, the request for judicial notice is denied.

complaint are true and make all reasonable inferences in the plaintiffs' favor and will only dismiss a claim if "it is beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." Montague v. Hundred Acre Homestead, LLC, 2019 VT 16, ¶ 10, __ Vt. __, 208 A.3d 609 (quotation and alteration omitted). The rule that a complaint need only "provide[] the defendant with notice of the claims against it" is an attempt to strike a balance between "encouraging valid, but as yet underdeveloped, causes of action and discouraging baseless or legally insufficient ones," mindful that the complaint's "purpose is to initiate the cause of action, not prove the merits of the plaintiff's case." Colby v. Umbrella, Inc., 2008 VT 20, ¶ 13, 184 Vt. 1, 955 A.2d 1082.

¶ 21.   We conclude that plaintiffs have stated claims of negligence by the State; gross negligence by Brent Raymond and James Candido; and breach of contract and of the covenant of good faith and fair dealing by the State. We affirm the dismissal of plaintiffs' remaining claims.

I.  Negligence (Count 11) and Negligent Misrepresentation (Count 5)[5]

¶ 22.   Plaintiffs allege that ACCD and the individual defendants had a special relationship with them that gave rise to a duty to exercise due care in the performance of its duties. In particular, they contend that ACCD undertook a duty to them to oversee and monitor the Jay Peak Projects to ensure compliance with all applicable laws, and that defendants breached this agreement to plaintiffs' detriment by failing to conduct any such oversight and monitoring. Plaintiffs also allege that they relied on numerous misrepresentations made by ACCD and the individual defendants concerning the projects and ACCD's oversight practices with respect to the projects. We affirm the dismissal of the negligence claims against the individually named defendants. However, we conclude that plaintiffs have stated claims for negligence and negligent misrepresentation against ACCD and that the Vermont Tort Claims Act waives the State's sovereign immunity with respect to these claims.

---

[5] We discuss the gross negligence claims against the individual defendants in Section II, below. See infra, ¶¶ 48-60.

7

A. Negligence Claim Against Individual Defendants

¶ 23.    The negligence claims against the individually named defendants, all current or former employees of the State, were properly dismissed.  Under 12 V.S.A. § 5602(a), in suits alleging injury caused by the acts or omissions of a state employee acting within the scope of their employment, "the exclusive right of action shall lie against the State of Vermont; and no such action may be maintained against the employee or the estate of the employee."  Plaintiffs do not appear to contend for the purposes of 12 V.S.A. § 5602(a) that the individually named defendants were acting outside the scope of their employment.  Accordingly, their claims for negligence lie solely against the State.

B. Negligence Claims Against ACCD

¶ 24.    The State contends that plaintiffs have failed to assert viable negligence claims and that plaintiffs' claim against the State is barred by sovereign immunity.  We reject both positions.

1. Viability of Plaintiffs' Negligence Claims

a. Negligence

¶ 25.    We conclude that plaintiffs have stated a claim for negligence based on ACCD's undertaking, and that the economic nature of their losses is not an impediment to such a claim. We reject plaintiffs' alternate theory of negligence predicated on federal law.

¶ 26.    Common-law negligence has four elements: a legal duty owed by the defendant to the plaintiff, a breach of that duty, injury to the plaintiff, and a causal link between the breach and the injury. Montague, 2019 VT 16, ¶ 14. Existence of a duty is primarily a legal question. LeClair v. LeClair, 2017 VT 34, ¶ 10, 204 Vt. 422, 169 A.3d 743.  In determining whether a duty exists, we consider "a variety of public policy considerations and relevant factors.  It is a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, the public interest at stake, and the foreseeability of the harm." Deveneau v. Wielt, 2016 VT 21, ¶ 8, 201 Vt. 396, 144 A.3d 324 (quotation and alteration omitted).  Underlying "these considerations is the basic tort rule that duty is measured by undertaking." Id. (quotation omitted).

8

¶ 27.    This Court has recognized that a legal duty may arise when a person "undertakes, gratuitously or for consideration, to render to another services that the person should recognize as necessary to protect the other." Sabia v. State, 164 Vt. 293, 302-03, 669 A.2d 1187, 1194 (1995) (quoting Restatement (Second) of Torts § 323 (1965)).  Little more than a gratuitous promise is necessary to find an undertaking. Id. at 303, 669 A.2d at 1194.  We have recognized before that a person "is subject to liability for physical harm resulting from negligent performance of the undertaking if (1) the negligence increases the risk of harm, or (2) the harm results from the other's reliance upon the undertaking." Id. (citing Restatement (Second) of Torts § 323 cmt. a).  This "applies whether the harm results from the defendant's negligent performance of the undertaking, or from the defendant's failure to exercise reasonable care to complete the undertaking or to protect the other person when the undertaking is discontinued." Id.  "[T]he undertaking may not be discontinued when the danger of harm to the other person increased as a result of the undertaking, or because the other person, in reliance upon the undertaking, was induced to forego other opportunities of obtaining assistance." Id.

¶ 28.    For example, in Langlois v. Town of Proctor, we held that a factfinder could find the Town of Proctor liable for negligent undertaking where a Town employee promised the plaintiff he would shut off water service to her building; Town workers were aware that harm to the building could result if the water was not disconnected; the plaintiff relied on the employee's promise to disconnect the water when she turned off the heat in the building; and the Town failed to shut off the water, causing damage to the building when the pipes froze and split, flooding the first floor and basement.  2014 VT 130, ¶¶ 1, 14-15, 198 Vt. 137, 113 A.3d 44.

¶ 29.    Plaintiffs' allegations, if true, would likewise establish liability for negligent undertaking. When ACCD employees induced prospective investors, including plaintiffs, to invest in the Jay Peak Projects by representing that ACCD would provide an unusually high level of oversight over those projects, including quarterly reviews to ensure that projects complied with all applicable laws and regulations, ACCD knew that harm could come to plaintiffs if it failed to

9

follow through on its promises. Plaintiffs reasonably relied on these representations in investing in the Jay Peak Projects. After inducing plaintiffs to invest in the Jay Peak Projects by promising to provide the "extra safeguard of state oversight," ACCD had a duty to provide that promised oversight. By allegedly failing to provide the promised oversight or compliance monitoring, ACCD increased the risk of harm to plaintiffs. Plaintiffs allege that this failure harmed them by leading them to "turn[] over their life savings to the fraud at the Jay Peak Projects," which they allege they lost as a result, and by causing them to be "displace[d] from their home countries by false promises of permanent residency in the United States." Accordingly, plaintiffs have made out a facial claim of negligence by ACCD.

¶ 30. The "economic-loss rule" is not a bar to plaintiffs' claim in this case. In its most general sense, with certain exceptions, the economic-loss rule prohibits recovery in tort for purely economic losses. See Long Trail House Condo. Ass'n v. Engelberth Constr., Inc., 2012 VT 80, ¶ 10, 192 Vt. 322, 59 A.3d 752; see also Gus' Catering, Inc. v. Menusoft Sys., 171 Vt. 556, 558, 762 A.2d 804, 807 (2000) (mem.) ("Negligence law does not generally recognize a duty to exercise reasonable care to avoid intangible economic loss to another unless one's conduct has inflicted some accompanying physical harm, which does not include economic loss." (quotation omitted)).

¶ 31. But courts have recognized a host of exceptions to this general principle.[6] See, e.g., Long Trail House Condo. Ass'n, 2012 VT 80, ¶ 13 (recognizing that there "might be recovery

_____

[6] Because of the plethora of exceptions to the broad formulation of the economic-loss rule, the Tentative Draft of the Restatement (Third) of Torts: Liability for Economic Harm articulates "a more limited principle: not that liability for economic loss is generally precluded, but that duties of care with respect to economic loss are not general in character; they are recognized in specific circumstances." Restatement (Third) of Torts: Liab. for Econ. Harm § 1 cmt. b (Tentative Draft No. 1, 2012) ("Stating the absence of a duty as a general rule can create confusion by seeming to threaten well-established causes of action, by leaving behind an uncertain and unwieldy number of exceptions, and by implying a needless presumption against the existence of a duty on facts not yet considered. The rule of this Section creates no such presumption. It merely means that duties to avoid causing economic loss require justification on more particular grounds than duties to avoid causing physical harm."). See also id. § 1 Reporter's Note a (describing "economic loss" as "potent source of confusion" within law of liability for negligence). The economic-loss provisions of the Restatement (Third) of Torts: Liability for Economic Harm cited in this opinion were approved at the 89th Annual Meeting of the American Law Institute. 89th Annual Meeting: 2012 Proceedings,

10

for purely economic losses in a limited class of cases" involving parties who have "a special relationship, which creates a duty of care independent of contract obligations," such as the obligation to avoid violating a "professional duty" (quotations omitted)); Springfield Hydroelectric Co. v. Copp, 172 Vt. 311, 316, 779 A.2d 67, 71 (2001) ("[C]ourts have permitted recovery for economic loss [where there is] a special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor." (quotation omitted)); cf. Limoge v. People's Tr. Co., 168 Vt. 265, 268-69, 719 A.2d 888, 890 (1998) (quoting Restatement (Second) of Torts § 552(1) (1977) and recognizing that one who, in the course of business, fails to exercise reasonable care and "supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information").

¶ 32.    The rationale underlying the economic-loss rule, which shapes the scope of and exceptions to that rule, rests on two main considerations.  First, "[e]conomic losses proliferate more easily than losses of other kinds," leading to indeterminate and disproportionate liability. Restatement (Third) of Torts: Liab. for Econ. Harm § 1 cmt. (c)(1) (contrasting impact of badly driven car, causing physical harm only to others nearby, with potential impact of single negligent utterance, causing economic loss to thousands of people who rely on it, in addition to those who relied on first round of victims).  Second, "[r]isks of economic loss tend to be especially well suited to allocation by contract."  Id. cmt. (c)(2) (explaining that "[a] contract that settles responsibility for such a risk [is] preferable in most cases to a judicial assignment of liability after harm is

---

Discussion of Restatement of the Law Third, Torts: Liability for Economic Harm, 89 A.L.I. Proc. 22, 46-47 (2012).  The A.L.I. states that "[o]nce it is approved by the membership at an Annual Meeting, a Tentative Draft . . . represents the most current statement of the American Law Institute's position on the subject and may be cited in opinions or briefs until the official text is published."    Am.  Law  Inst.,  Torts:  Liability  for  Economic  Harm  (2018), https://www.ali.org/projects/show/torts-liability-economic-harm-3rd/    [https://perma.cc/GV9G-9MY8].

done).")[7] Courts have recognized duties to prevent economic loss when these rationales are weak or absent. Id. cmt. d. So, for example, those who, in the course of their business, profession, or employment, perform services for the benefit of a limited group of persons may be subject to liability for pecuniary loss caused to those who relied upon the service by a failure to exercise reasonable care in performing the service. Id. § 6.

¶ 33. Here, plaintiffs have alleged sufficient facts to make out a special relationship between defendants and plaintiffs such that they may recover for their purely economic losses. ACCD initiated a close relationship with the plaintiffs by recruiting them to invest their life savings in the Jay Peak Projects by promising exceptional oversight and management of the investment. As discussed above, ACCD demonstrated awareness of the risk that it was inducing plaintiffs to undertake—a risk it represented it would minimize—when it told plaintiffs it would provide a safeguard for their investments. ACCD did not simply endorse the Jay Peak Projects to members of the public generally; it personally solicited individual investors, and entered into individualized relationships with each of the plaintiffs, who paid substantial fees directly to the VRC in connection with that relationship. It intended to influence a narrow class of identified people—prospective investors in the Jay Peak Projects—and those who actually invested relied on their representations and promised oversight. This is the kind of relationship that can give rise to liability for purely economic harms.

¶ 34. For the purposes of subsequent proceedings in this case, we note that we do not embrace plaintiffs' theory of negligence resting on defendants' alleged violation of federal regulations that impose a duty of care on defendants for plaintiffs' benefit. We conclude that the

---

[7] For this reason, if the factfinder ultimately concludes that defendants entered into a contract with plaintiffs, the economic-loss rule may preclude recovery in tort rather than contract. See Walsh v. Cluba, 2015 VT 2, ¶¶ 26-32, 198 Vt. 453, 117 A.3d 798. The tort theory of liability we acknowledge here "typically serves as a substitute for a contract between two parties who cannot conveniently write one, and whose affairs will be made simpler and more efficient if the party who invites the reliance has enforceable obligations to the party who accepts the invitation." Restatement (Third) of Torts: Liab. for Econ. Harm § 1 cmt. (d)(2).

regulations to which plaintiffs point do not support that theory. Plaintiffs rely on Denis Bail Bonds, Inc. v. State, in which we held that, in determining whether a governmental body has undertaken a duty of care toward certain individuals, we may consider:

> (1) whether an ordinance or statute sets forth mandatory acts clearly for the protection of a particular class of persons, rather than the public as a whole; (2) whether the government has actual knowledge of a condition dangerous to those persons; (3) whether there has been reliance by those persons on the government's representations and conduct; and (4) whether failure by the government to use due care would increase the risk of harm beyond its present potential.

159 Vt. 481, 487, 622 A.2d 495, 499 (1993). Plaintiffs argue that 8 C.F.R. § 204.6(m)(6) imposes such "mandatory acts clearly" set out "for the protection of a particular class of persons," but in fact this regulation simply requires regional centers to explain how they will increase economic growth within their targeted region:

> Each regional center wishing to participate in the Immigrant Investor Pilot Program shall submit a proposal to the Assistant Commissioner for Adjudications, which:
>
> (i) Clearly describes how the regional center focuses on a geographical region of the United States, and how it will promote economic growth through increased export sales, improved regional productivity, job creation, and increased domestic capital investment;
>
> (ii) Provides in verifiable detail how jobs will be created indirectly through increased exports;
>
> (iii) Provides a detailed statement regarding the amount and source of capital which has been committed to the regional center, as well as a description of the promotional efforts taken and planned by the sponsors of the regional center;
>
> (iv) Contains a detailed prediction regarding the manner in which the regional center will have a positive impact on the regional or national economy in general as reflected by such factors as increased household earnings, greater demand for business services, utilities, maintenance and repair, and construction both within and without the regional center; and
>
> (v) Is supported by economically or statistically valid forecasting tools, including, but not limited to, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and/or multiplier tables.

13

8 C.F.R. § 204.6(m)(3). We reject plaintiffs' contention that this regulation imposed on ACCD mandatory duties for plaintiffs' protection. The focus of these federal regulations is ensuring that regional centers promote the economic growth and job creation they are charged with fostering. Plaintiffs may benefit indirectly from this duty, but we cannot agree that their financial protection is the target of these regulations. We reach the same conclusion with respect to the directives in the USCIS forms approving ACCD's designation as a regional center.

### b. Negligent Misrepresentation

¶ 35. We conclude that plaintiffs have stated a claim for negligent misrepresentation. We have adopted the Restatement (Second) of Torts definition of negligent misrepresentation, which imposes liability on those "who, in the course of [their] business, profession or employment, or in any other transaction in which [they have] a pecuniary interest, [supply] false information for the guidance of others in their business transactions," if the others suffer pecuniary loss caused by their justifiable reliance upon the information. Limoge, 168 Vt. at 268-69, 719 A.2d at 890 (citing Restatement (Second) of Torts § 552(1)). In the absence of a public duty to supply the information, liability for negligent misrepresentation is limited to loss suffered by, among others, "the person or one of a limited group of persons for whose benefit and guidance" the supplier intends to supply the information, and only in connection with reliance on the information in a transaction that the supplier intends the information to influence. Restatement (Second) of Torts § 552(2).

¶ 36. That plaintiffs' allegations fit this definition is not seriously in dispute. The economic-loss rule is not an impediment to this claim, and the Restatement (Second) provision describing the tort applies, by its own terms, to "pecuniary loss" rather than physical harm. Id. § 552(1); see also id. cmt. a (explaining that rule applies only to pecuniary loss, and adopting more restricted rule of liability than negligent misrepresentation that results in physical harm).

14

## 2. Sovereign Immunity

¶ 37. Sovereign immunity protects the State and its components from suit unless it is expressly waived by statute. Jacobs v. State Teachers' Ret. Sys. of Vt., 174 Vt. 404, 408, 816 A.2d 517, 521 (2002). The Vermont Tort Claims Act waives the State's immunity with respect to suits for injury to persons caused by the negligent acts of employees of the State acting within the scope of their employment "under the same circumstances, in the same manner, and to the same extent as a private person would be liable to the claimant." 12 V.S.A. § 5601(a). The Act contains a number of exceptions, including that it does not waive immunity for claims "based upon the exercise or performance or failure to exercise or perform a discretionary function." Id. § 5601(e)(1). We conclude that plaintiffs' claims are comparable to recognized causes of action against private persons and that the discretionary function exception to the State's waiver of sovereign immunity in the Tort Claims Act does not apply to these allegations.

### a. Applicability of Plaintiffs' Claims to a Private Person

¶ 38. Under the Tort Claims Act, "the State waives its immunity only to the extent a plaintiff's cause of action is comparable to a recognized cause of action against a private person." Sabia, 164 Vt. at 298, 669 A.2d at 1191 (citation omitted). On this basis, we have concluded that the Tort Claims Act did not waive the State's sovereign immunity with respect to a suit against the State based on the Office of Child Support's (OCS's) alleged negligent failure to enforce a child-support order because no private analog to this claim existed. Powers v. Office of Child Support, 173 Vt. 390, 398, 795 A.2d 1259, 1265 (2002). We explained that OCS's duties were "uniquely governmental" in that its enforcement actions are " 'broadly discretionary' and serve[] a variety of state policies and interests wholly apart from the collection of debts." Id. at 396-97, 795 A.2d at 1264 (quoting Noble v. Office of Child Support, 168 Vt. 349, 353, 721 A.2d 121, 124 (1998)).

¶ 39. On the other hand, we concluded that the State waived its sovereign immunity as a defense to a suit based on the failure of a state agency to perform its statutory duty to assist children seeking protection from reported and substantiated abuses because a private analog existed under

15

the facts of that case. <u>Sabia</u>, 164 Vt. at 300, 669 A.2d at 1192. In particular, we explained that the tort claim was analogous to a claim based on negligent performance of a gratuitous undertaking where the negligence increases the risk of harm or the harm results from the other's reliance upon the undertaking—the exact claim plaintiffs have made in this case. <u>Id</u>. at 302-03, 669 A.2d at 1193-94. Significantly, we explained that a private analog existed in that case even though the acts and omissions at issue were performed by state social workers in the context of their child-protection duties—functions for which there is no apparent direct analog. <u>Id</u>. at 301-02, 669 A.2d at 1193. See also <u>Kennery v. State</u>, 2011 VT 121, ¶ 29, 191 Vt. 44, 38 A.3d 35 ("Because the duty of care in this case arises from common law, and is the same whether or not the tortfeasor is a private individual or a public employee, the [private-analog] requirement is inapplicable.").

¶ 40. As in <u>Sabia</u> and <u>Kennery</u>, plaintiffs' negligent-undertaking theory of negligence here is based on a common-law theory of negligence that is equally applicable to government employees and private individuals. Likewise, plaintiffs' negligent-misrepresentation claim is a well established common-law claim.

¶ 41. Moreover, this is an even stronger case than <u>Sabia</u> in that there was nothing uniquely governmental about ACCD's alleged acts and omissions upon which plaintiffs base their claims. As noted above, plaintiffs have alleged that there are hundreds if not thousands of regional centers throughout the United States, and <u>virtually all of them are private ventures</u>. Plaintiff's claim is emphatically <u>not</u> a claim against ACCD for negligent enforcement of state laws or regulations within its purview; it is a claim based on ACCD's promises and undertakings in connection with a generally, although not exclusively, private activity—operating a regional center. For these reasons, we conclude that, unless an exception applies, the Vermont Tort Claims Act waives the State's sovereign immunity with respect to plaintiffs' claims.

b. Discretionary Function Exception

¶ 42. Plaintiffs' allegations, viewed in the light most favorable to them, support a conclusion that their claims are not excluded from the State's waiver of sovereign immunity in the

16

Vermont Tort Claims Act on the basis that they relate to discretionary functions. See 12 V.S.A. § 5601(e)(1) (establishing that waiver of sovereign immunity does not apply to claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a State agency or an employee of the State").

¶ 43.    We use a two-part test, adopted from United States v. Gaubert, 499 U.S. 315, 322-25 (1991), to determine whether a challenged act or omission is discretionary. Estate of Gage v. State, 2005 VT 78, ¶ 5, 178 Vt. 212, 882 A.2d 1157 (explaining that this Court has adopted Gaubert's two-part test for determining applicability of discretionary function exception). The first prong asks "whether a statute, regulation, or policy mandates certain acts, or whether performance of a duty involves an element of judgment or choice." Ingerson v. Pallito, 2019 VT 40, ¶ 13, __ Vt. __, __ A.3d __. An act is discretionary "where there is no specifically dictated course of action for the employee to follow." Amy's Enters. v. Sorrell, 174 Vt. 623, 625, 817 A.2d 612, 617 (2002) (mem.). Acts furthering policy decisions are shielded by the discretionary function exception only if there is "a range of discretion to exercise in deciding how to carry out" that decision. Gaubert, 499 U.S. at 325. The government's acts or omissions in carrying out—or failing to carry out—policy decisions are otherwise not considered discretionary: "[W]hile the discretionary function exception shields the State from liability for administrative and policymaking decisions, it will not excuse the State from liability for failure to act when required or for failure to use reasonable care when executing ministerial tasks in furtherance of a discretionary undertaking." Ingerson, 2019 VT 40, ¶ 17.

¶ 44.    If the first prong is met, we proceed to the second prong, which asks whether the judgment involved in the challenged act or omission was "based on public policy considerations; decisions not related to public policy are not immune from suit." Id. ¶ 14. The second prong ensures that the discretionary function exception applies only where it serves its purpose of "assur[ing] that the courts do not invade the province of coordinate branches of government by passing judgment on legislative or administrative policy decisions through tort law." Searles v.

17

Agency of Transp., 171 Vt. 562, 563, 762 A.2d 812, 813 (2000) (mem.) (quotation omitted). If the challenged action "involves negligence unrelated to any plausible policy objectives, then the second prong of the test is not satisfied, and the discretionary function exception does not apply." Ingerson, 2019 VT 40, ¶ 14 (quotation omitted).

¶ 45.   Here, the first prong of the Gaubert test—that the challenged acts or omissions involved discretionary decisions—is not met.  499 U.S. at 325.  The challenged omission is the failure to conduct oversight of the Jay Peak Projects in the manner the VRC undertook to—and represented to the investors that it would—oversee them.  This includes the VRC's failure to conduct the quarterly compliance reviews and "financial monitoring and auditing of projects to ensure legitimacy" that ACCD employees represented to plaintiffs that the State conducted.  Once the State had undertaken to conduct such compliance reviews, conducting them was no longer a discretionary function: There was a "specifically dictated course of action for the employee[s] to follow." Amy's Enters., 174 Vt. at 625, 817 A.2d at 617.  While some discretionary decisions as to how to carry out the reviews, monitoring, and auditing may have remained once the State committed to doing them, the State's alleged failure to conduct any such reviews, monitoring, or auditing was a ministerial failure—a failure to follow a specifically dictated course of action.  On the facts as alleged here, the Vermont Tort Claims Act waives the State's sovereign immunity.

¶ 46.   Likewise, with respect to the negligent misrepresentation claim, even if ACCD employees had some discretion as to what representations to make to plaintiffs, satisfying the first prong of the Gaubert test, we cannot discern any state policy they could have been furthering by misrepresenting ACCD's oversight role and practices.

¶ 47.   For these reasons, the trial court erred in dismissing Count 5—the negligent misrepresentation claim—and Count 11—the negligence claim—to the extent that they are directed against the State rather than the individual defendants.

18

## II. Gross Negligence Against Individual Defendants (Count 6)

¶ 48.    Plaintiffs allege that the named defendants—James Candido, John Kessler, Lawrence Miller, Eugene Fullam, Patricia Moulton, and Brent Raymond—are liable for gross negligence because they induced plaintiffs to rely on them, and knew or should have known plaintiffs were relying on them, "to oversee, manage, administer, and ensure the regulatory compliance of the investments entrusted to the Jay Peak Projects," and then grossly failed to exercise due care in conducting such oversight and management, leading to plaintiffs' loss of their investments in the Jay Peak Projects, displacement from their home countries, and "the endangerment of [p]laintiffs' permanent residency in the United States."

¶ 49.    As an initial matter, we note that the Vermont Tort Claims Act does not bar claims against state employees for gross negligence.  Although under 12 V.S.A. § 5602(a) the exclusive right of action for harm to people or property done by state employees who were acting within the scope of their employment is against the State, § 5602(b) creates an exception for claims based on "gross negligence or willful misconduct."  Accordingly, plaintiffs harmed by state employees' gross negligence may sue those employees for damages, even if the employees' actions were undertaken within the scope of their employment.  We consider whether the respective defendants are protected from liability by immunity and, to the extent they are not, whether plaintiffs' allegations can establish gross negligence.

### A.  Immunity

¶ 50.    We recognize two forms of immunity for government employees: absolute immunity and qualified immunity.  Kennery, 2011 VT 121, ¶ 43.  Absolute immunity protects judges, legislators, and "the highest executive officers" from suit "where the acts complained of are performed within their respective authorities."  O'Connor v. Donovan, 2012 VT 27, ¶ 6, 191 Vt. 412, 48 A.3d 584 (quotation omitted).  Such officers are entitled to absolute immunity even when their acts fall within the "outer perimeter of [their] authority and discretion."  Id. ¶ 9 (quotation omitted).  The State's other officers, employees, and agents are entitled to qualified

19

immunity from suit, but only if, when undertaking the challenged acts, they were "1) acting during the course of their employment and within the scope of their authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial acts." Id. ¶ 6 (alteration and quotation omitted).

¶ 51. For the reasons set forth below, we conclude that defendants Lawrence Miller and Patricia Moulton, former Secretaries of the ACCD, are absolutely immune from suit. Plaintiffs' claim against Eugene Fullam fails because plaintiffs have not alleged conduct by him that would overcome qualified immunity. We need not decide whether John Kessler is entitled to qualified immunity because we conclude plaintiffs have not made out a claim of gross negligence against him. Plaintiffs have adequately alleged that Brent Raymond and James Candido are not shielded by qualified immunity and have made allegations that could establish gross negligence.

### 1. Absolute Immunity—Defendants Miller and Moulton

¶ 52. Patricia Moulton and Lawrence Miller are entitled to absolute immunity because they are being sued for alleged actions undertaken when they were Secretaries of ACCD, and the actions at issue fell within the general authority of their office. Plaintiffs do not dispute that as the highest executive officer in ACCD, the Secretary is entitled to absolute immunity for actions undertaken within the office's general authority. Plaintiffs contend, however, that Moulton and Miller were not acting within the scope of their office's general authority "because they had no state authority to run a federal immigration program in this manner." Plaintiffs' complaint, however, does not bear out their contention that Moulton and Miller's involvement in promoting EB-5 projects was outside the realm of their office's general authority. The complaint says that "ACCD is charged with . . . enhancing Vermont's business climate, marketing Vermont to businesses and individuals, along with facilitating, promoting and creating business opportunities within Vermont to contribute to the economic viability and growth of the State." It says ACCD operated as a regional center, and regional centers "provide a pathway for the flow of billions of dollars in investor funds within the United States" by performing administrative functions for EB-

20

5 projects. Operating a regional center was thus not "run[ning] a federal immigration program," but rather was in line with ACCD's mission of "promoting and creating business opportunities," and so fell at least within the "outer perimeter of [Miller and Moulton's] authority and discretion." O'Connor, 2012 VT 27, ¶ 9.

### 2. Qualified Immunity—Defendants Fullam, Kessler, Raymond and Candido

¶ 53.　Government employees who are not entitled to absolute immunity may still be eligible for qualified immunity if, when undertaking the challenged acts, they were, in good faith, performing discretionary acts within the course of their employment and the scope of their authority. Id. ¶ 6. The test for good faith is "the objective reasonableness of the official's conduct." Amy's Enters., 174 Vt. at 625, 817 A.2d at 617. We have held that "acts are objectively reasonable if an officer of reasonable competence could have made the same choice in similar circumstances." Id. If "plaintiffs cannot show" that a defendant was acting outside the course of their employment and scope of their authority or "that defendant's conduct . . . was ministerial rather than discretionary in nature or that defendant acted in bad faith or violated clearly established law, [the] defendant is immune from their lawsuit." Baptie v. Bruno, 2013 VT 117, ¶ 16, 195 Vt. 308, 88 A.3d 1212. We review the allegations against each individual defendant in light of this test.

### a. Defendant Fullam

¶ 54.　Plaintiffs' sole allegation regarding Eugene Fullam, a former executive director of the VRC, is that he marketed and solicited investors for the Jay Peak Projects. Plaintiffs have thus not alleged any facts to show that he was not "1) acting during the course of [his] employment and within the scope of [his] authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial acts." O'Connor, 2012 VT 27, ¶ 6 (alteration and quotation omitted). Accordingly, Fullam is entitled to qualified immunity.[8]

---

[8] Moreover, we note that the allegations in the complaint would be insufficient to establish gross negligence by Fullam.

## b. Defendant Kessler

¶ 55.     Plaintiffs allege that John Kessler, who is general counsel for the ACCD, marketed and solicited investors for the Jay Peak Projects, in the course of which he made misrepresentations as to the VRC's oversight, and that he disregarded warnings of securities violations.  We do not reach the question of whether he is entitled to qualified immunity because we conclude plaintiffs could not make out claims of gross negligence against him on these facts, as we discuss further below.  See infra, ¶¶ 60.

## c. Defendant Raymond

¶ 56.     Plaintiffs have alleged that Brent Raymond, another former executive director of the VRC, marketed and solicited investors for the Jay Peak Projects, and in doing so, "misrepresented that the VRC acted as an independent overseer of the Jay Peak Projects with duties of tracking investor funds to-and-from escrow, the status of investor capital, and requiring quarterly reports from the Jay Peak Projects."  They claim that in May 2014, about twenty investors sent Raymond "complaints about the Jay Peak Projects' misappropriation of investor funds," and he "deflected investor complaints and continued to provide the necessary cover for the Jay Peak Projects and the VRC Team's involvement."  They further allege that when they "were unable to elicit a response from" the Jay Peak Projects about issues including "proof of the source-and-use of Jay Peak Investor funds, they approached the state overseers—the VRC's Executive Director, Brent Raymond, and the VRC Team—to make good on their prior representations and voluntarily assumed duties of state oversight of the Jay Peak Projects and extract the relevant documents."  But "Raymond claimed that the VRC had no legal authority to conduct financial reviews" and told one plaintiff that the VRC had "not been auditing [the Jay Peak Projects'] financials—nor are we required to, or ever represented that we were."  (Alteration in original.)  He "lambasted" plaintiffs for " 'how farfetched' their expectations were for the VRC to monitor, oversee, or otherwise review financial documents relating to the Jay Peak Projects."  He then told a Jay Peak investor that "the VRC does not prepare quarterly reports on projects so we have no reports to provide

22

you." (Alterations omitted.) Raymond then "used the Jay Peak Investors' inability to acquire the Jay Peak Projects' source-and-use of investor funds as an obstacle to investigate their claims" by telling them that until the investors supplied evidence to "support their allegations of fraud," the VRC "would not investigate." Because "the Jay Peak Investors were asking the VRC for help in acquiring such evidence, it became apparent that the VRC would not be investigating." Plaintiffs allege that Raymond did this to "protect the VRC's Jay Peak partners." Finally, they allege that in January 2015, even after receiving complaints about the Jay Peak Projects' misappropriation of investor funds, he approved the Jay Peak Projects to solicit investors for further projects. These allegations—that Raymond made misrepresentations to investors about the financial oversight that the VRC provided over the projects, then later said the VRC could not and would not provide financial oversight and would not investigate the claims of fraud; acted to protect the Jay Peak Projects instead of the investors; and then even in the face of complaints alleging that the Projects were misappropriating funds, approved the Projects to solicit more investors—are sufficient to show that his conduct fails the good-faith prong, as no "officer of reasonable competence could have made the same choice in similar circumstances." Amy's Enters., 174 Vt. at 625, 817 A.2d at 617. For that reason, at this stage in the litigation we cannot conclude that defendant Raymond is protected by qualified immunity.

d. Defendant Candido

¶ 57. Plaintiffs allege that James Candido, another former executive director of the VRC, marketed and solicited investors for the Jay Peak Projects, and in doing so, "misrepresented that the VRC acted as an independent overseer of the Jay Peak Projects with duties of tracking investor funds to and from escrow, the status of investor capital, and requiring quarterly reports from the Jay Peak Projects." When meeting with investors, he "touted the VRC's unique state oversight as a reason to choose an EB-5 project overseen by the VRC." At one point, an EB-5 industry professional and registered broker-dealer "alerted the VRC to various securities violations by the Jay Peak Projects by sending detailed emails" to employees including James Candido and John

23

Kessler. When a consulting firm that had helped solicit potential investors raised concerns with the VRC that the Jay Peak Projects were illegally misappropriating funds, Candido "conducted a supposed . . . audit-visit to the Jay Peak Projects and purportedly found 'no issues' with the Jay Peak Projects' financials. However, no record or report of [the] 'audit-visit' was produced." During that visit, plaintiffs allege that Candido coordinated with an attorney with financial ties to the Projects to inspect the Projects and issue a report responding to the consulting firm's claims. Plaintiffs allege that the attorney spent "an extravagant weekend" at the Jay Peak Projects, after which he issued a report "painting a glowing picture of a successful EB-5 project" that "highlight[ed] . . . the 'particularly careful' oversight" by the VRC. That report also said Candido inspected the Jay Peak Projects' financial records at least four times a year and that the Projects' records would also be audited by an independent accounting firm, although neither actually happened. Moreover, as the investors became aware of the consulting firm's concerns, plaintiffs allege that Candido made intentional misrepresentations to investors by telling them that the firm made the allegations "due to a business dispute," and "that he had investigated and reviewed everything and that it was safe to make an investment." As with Raymond, these allegations—essentially, that Candido made intentional misrepresentations to potential investors about the financial oversight the VRC provided and covered up the fraud occurring within the Projects—if true could show that Candido's conduct also fails the good-faith prong. Amy's Enters., 174 Vt. at 625, 817 A.2d at 617.

### B. Sufficiency of Allegations

¶ 58. Plaintiffs have stated sufficient claims of gross negligence against Brent Raymond and James Candido, although not against John Kessler. "Gross negligence is negligence that is more than an error of judgment; it is the failure to exercise even a slight degree of care, owed to another." Kennery, 2011 VT 121, ¶ 41 (quotation omitted). In other words, to establish gross negligence, a plaintiff must show a defendant "heedlessly and palpably violated a legal duty owed to plaintiff." Amy's Enters., 174 Vt. at 624, 817 A.2d at 616 (quotation omitted); see also Kane

24

v. Lamothe, 2007 VT 91, ¶ 13, 182 Vt. 241, 936 A.2d 1303 (reciting that "wholesale absence of care or indifference to duty owed . . . is necessary to state a viable claim for gross negligence"). Whether the defendant's conduct rose to the level of "[g]ross negligence is ordinarily a question of fact for the jury, and an allegation of gross negligence may be dismissed by the court only if reasonable minds cannot differ." Kennery, 2011 VT 121, ¶ 41. We have held that where an elderly woman's daughter asked state troopers to check that her mother, who lived alone, was safe, and the troopers searched the wrong house—and so failed to find the mother, who had collapsed in her backyard and ultimately became hypothermic—the troopers' failure to use reasonable care could rise to the level of gross negligence. We noted in particular that the troopers' "multiple errors in judgment in performing a straightforward task" where the need for care was particularly great could together justify a jury finding that the troopers' conduct went beyond simple incompetence or questionable decisions and entered the realm of gross negligence. Id. ¶ 42.

¶ 59. A jury could likewise find gross negligence by Raymond and Candido here. Plaintiffs' claims of gross negligence are structurally similar to their claims of negligence: plaintiffs allege that defendants intentionally misrepresented to plaintiffs that the State provided financial oversight of the Jay Peak Projects in order to induce them to invest, and then, knowing that the investors were relying on them to conduct such oversight, failed to ensure that any was actually conducted, which contributed to plaintiffs' injuries, including losing their investments in the Projects and having their residency in the United States endangered. But beyond simply failing to ensure that any real oversight was conducted, plaintiffs also allege that Raymond and Candido actively worked to protect the Jay Peak Projects from oversight and investigation and covered up fraud within the Projects. If evidence bears out these claims, a jury could find that Raymond and Candido "heedlessly and palpably violated" the legal duty they assumed when they represented to investors that they should invest in the Jay Peak Projects because the State would protect their investments by providing financial oversight. Amy's Enters., 174 Vt. at 624, 817 A.2d at 616 (quotation omitted).

25

¶ 60.    A jury could not, however, find gross negligence by John Kessler on the facts alleged by plaintiffs.  Plaintiffs allege that he marketed and solicited investors for the Jay Peak Projects, and in doing so, "misrepresented that the VRC acted as an independent overseer of the Jay Peak Projects with duties of tracking investor funds to-and-from escrow, the status of investor capital, and requiring quarterly reports from the Jay Peak Projects."  Plaintiffs also allege that an EB-5 industry professional and registered broker-dealer sent Kessler detailed emails regarding securities violations by the Jay Peak Projects.  These allegations suggest questionable judgment but do not demonstrate "failure to exercise even a slight degree of care, owed to another." Kennery, 2011 VT 121, ¶ 41 (quotation omitted).

III.  Breach of Contract and Covenant of Good Faith and Fair Dealing (Counts 3 and 4)

¶ 61.    We conclude that plaintiffs have made out claims against ACCD for breach of contract and breach of the implied covenant of good faith and fair dealing.[9]  Plaintiffs have alleged sufficient facts to support their claim that ACCD, hoping to gain the benefits of investments in the Jay Peak Projects, offered to undertake "specific oversight obligations" if plaintiffs invested, and then, after plaintiffs performed by investing, which caused a contract to form, ACCD breached that resulting contractual obligation.  Although plaintiffs have argued that this contract was created by the MOUs—which we conclude it was not—we hold that plaintiffs have nonetheless made out a claim for breach of contract and of the implied covenant of good faith and fair dealing sufficient to meet our lenient notice-pleading standards.

¶ 62.    The essential requirements for a contract are "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."  Restatement (Second) of Contracts § 17(1) (1981).  A unilateral contract will form where an offeror makes an offer that can be accepted by performance, and the offeree performs.  Ragosta v. Wilder, 156 Vt. 390, 394, 592

---

[9]  Plaintiffs initially at least nominally pled breach-of-contract and breach-of-the-covenant-of-good-faith-and-fair-dealing claims against all defendants, but on appeal address only the claims against the State.  Accordingly, we consider only the breach-of-contract and breach-of-covenant claims against the State.

A.2d 367, 370 (1991) (stating that "under a unilateral contract . . . the offeree must accept, if at all, by performance, and the contract then becomes executed" (quoting Multicare Medical Center v. State Soc. & Health Servs., 790 P.2d 124, 131 (Wash. 1990) (superseded by statute))). Consideration sufficient for contract formation can include a broad range of benefits: The "definition of a benefit is extremely broad, and requires simply that [promisors] receive something desired for [their] own advantage." Kneebinding, Inc. v. Howell, 2014 VT 51, ¶ 17, 196 Vt. 477, 99 A.3d 612 (quotation omitted).

¶ 63. Plaintiffs' allegations, if true, would establish formation of a unilateral contract between the investors and ACCD, which ACCD breached. ACCD offered to plaintiffs that if they invested in the Jay Peak Projects, it would provide "oversight, administration, management, and regulatory compliance of the Jay Peak Projects for the specific benefit of Plaintiffs." Plaintiffs' allegations support an inference that, as part of the oversight ACCD pledged to undertake, ACCD promised to enforce the Jay Peak Projects' financial-reporting requirements under the MOUs. This constituted an offer: ACCD wished to receive the benefit of investments in the Jay Peak Projects, which would serve its goal of promoting economic development in the state, so it offered to plaintiffs that if they made the requisite investment, it would provide financial oversight over the Projects. Plaintiffs accepted ACCD's offer by performing: they invested in the Projects. At that point, a contract obligating ACCD to fulfill its promises formed. ACCD subsequently failed to provide any of the promised oversight, breaching its contractual obligations to plaintiffs.

¶ 64. Plaintiffs' allegations could likewise support a claim for breach of the covenant of good faith and fair dealing. The covenant, which is implied in every contract, serves to "ensure that parties to a contract act with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Monahan v. GMAC Mortg. Corp., 2005 VT 110, ¶ 36, 179 Vt. 167, 893 A.2d 298 (quotation omitted); see also Carmichael v. Adirondack Bottled Gas Corp. of Vt., 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993) ("An underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's

27

rights to receive the benefits of the agreement."). Plaintiffs allege that "the parties were bound to execute their agreement for oversight, management, administration, and regulatory compliance services consistent with the covenant of good faith and fair dealing," and that defendants failed to do so. Plaintiffs' allegation that ACCD failed to provide the promised financial oversight establishes a failure by ACCD to act consistently with plaintiffs' "justified expectations" pursuant to their contract for oversight, and makes out a claim for breach of the covenant of good faith and fair dealing. Monahan, 2005 VT 110, ¶ 36.

IV. Third-Party Beneficiary Breach of Contract (Count 8)

¶ 65. We conclude that the trial court properly dismissed plaintiffs' claims for breach of contract based on a theory that plaintiffs were third-party beneficiaries of the MOUs between ACCD and the Jay Peak Projects because we conclude that, although ACCD assumed contractual obligations to plaintiffs by soliciting their investments and touting their oversight, the MOUs did not directly give rise to duties on the part of ACCD that are enforceable by the plaintiffs.

¶ 66. Contracting parties may agree to create obligations to a third party, which the third party may enforce against the promisor—the party obligated to perform for the third party—if the promisor breaches. In other words, "[a] promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty." Restatement (Second) of Contracts § 304 (1981). Whether a party is an intended beneficiary, and thus has a right to enforce the contract, "is based on the original contracting parties' intention," and "[a]s with any contract provision, we first look to the language of the contract provision" to determine what that intent was. Hemond v. Frontier Commc'ns of Am., Inc., 2015 VT 67, ¶ 20, 199 Vt. 272, 123 A.3d 1176 (quotations omitted); see also Restatement (Second) of Contracts § 302(1) ("A beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."). If the contract "language is unambiguous, there is no need to consider evidence

28

outside of the writing." Hemond, 2015 VT 67, ¶ 20. The fact that a contract would benefit a third party does not mean the third party has a right to enforce it. Many contracts benefit third parties, but those third parties are treated as incidental beneficiaries unless the contract language specifically indicates an intent to benefit them. McMurphy v. State, 171 Vt. 9, 18, 757 A.2d 1043, 1050 (2000).

¶ 67. The MOUs did not create obligations running from ACCD to plaintiffs; rather, they created obligations by the Jay Peak Projects to assist ACCD in administering the projects and reporting to USCIS, and obliged ACCD to take minor steps in aid of that goal, such as "promptly request[ing] that USCIS acknowledge ACCD's designation of Jay Peak to assist in the management, administration and overall compliance of the Alien Entrepreneur project organized by Jay Peak within ACCD's Regional Center." Each MOU contained prefatory language explaining that:

> ACCD and Jay Peak desire an arrangement whereby Jay Peak . . . will assist [in] the oversight, administration, management and overall compliance of the Jay Peak project with legal and regulatory requirements, and Jay Peak will formally report in writing not less than every three (3) months upon the activities of the project to ACCD and respond to any ongoing ACCD inquiries about the project and assist ACCD to comply with its obligations as a USCIS approved and designated regional center with respect to this project.[10]

The Jay Peak Projects and ACCD therefore agreed, among other things, that:

> Jay Peak will provide support to ACCD including, but not limited to, providing investment-related and supporting documentation to prospective investors, supplying economic analysis and modeling

---

[10] Although this language reflects that ACCD had duties including "oversight, administration, management and overall compliance of the Jay Peak Projects with legal and regulatory requirements" and that ACCD had reporting duties to USCIS, the MOU does not purport to obligate ACCD to perform those duties, but rather obligates the Jay Peak Projects to provide assistance to ACCD. Moreover, because it is mere prefatory language, not part of the substance of the parties' agreement, we would only consult it to understand the substance of the parties' agreement if the language of the agreement were ambiguous—which it is not. "While a recital in the preamble or elsewhere in a deed or contract may be consulted in aid of the interpretation of an ambiguity in the instrument, it cannot control the dispositive or operative portion, when this is clear and definite, or create a doubt which does not otherwise exist." Davidson v. Vaughn, 114 Vt. 243, 248-49, 44 A.2d 144, 147 (1945).

reports on direct and indirect job creation, defining investment opportunities within the Jay Peak project, and assisting ACCD to comply with relevant regulatory or administrative requirements in support of individual petitions filed with [USCIS] by immigrant investors affiliated with the Jay Peak project, such as providing area maps, valid unemployment data, general economic data and demographics concerning the geographic area covered by the Jay Peak project.

Jay Peak will further support ACCD's compliance with regional center requirements by providing on a quarterly basis formal written progress reports on its activities, overseas meetings and other relevant efforts . . . to promote investment . . . . The Quarterly reports will set forth for the preceding quarter and year-to-date the number of investors, the status of alien investor capital (in escrow, transfers from escrow to the limited partnership) and activity of the limited partnership in furtherance of the project.

. . . .

Jay Peak will support the purpose and goals of ACCD's Regional Center by encouraging investment and employment creation within the Regional Center through . . . establishing escrow accounts to assist orderly investment in the project; facilitating, on a fee basis, the preparation and submission of the I-526, Alien Entrepreneur petition and petitions for other immigration benefits to USCIS . . . for individual investors; providing the primary entity and related entities to carry out the activities of the project; structuring the enterprise so that it creates requisite employment prior to the investors seeking removal of conditions; seeing to the timely completion and opening of the project; providing operating expertise and personnel to operate the project efficiently; and, if requested by individual investors, making referrals to advisors who may assist with issues arising from relocation by the investor and the investor's spouse and children to the United States.

Because this MOU language unambiguously indicates no intent to create obligations running from ACCD to plaintiffs, plaintiffs are at most incidental beneficiaries of the agreement between ACCD and the Jay Peak Projects.

¶ 68. Plaintiffs claim they are intended beneficiaries of the MOUs because they allege that the MOUs were attached to every offering document for the Jay Peak Projects, and offering documents were issued to each investor, "evincing a clear intent" by the Jay Peak Projects and defendants to benefit plaintiffs. Because this is a question of contract interpretation, we look first to the language of the MOU, and only if it is ambiguous—meaning that reasonable people could

30

understand it differently—will we look beyond its four corners to understand its meaning. Towslee v. Callanan, 2011 VT 106, ¶ 5, 190 Vt. 622, 55 A.3d 240 (mem.) (reciting that "if reasonable people could differ as to its interpretation, a provision is ambiguous and the court should look beyond the plain language to discern the parties' intent" (quotation omitted)). If the MOUs were ambiguous, defendants' subsequent representations to plaintiffs about what the MOUs meant could be helpful in construing the ambiguous language. "In the process of interpretation of the terms of a contract, the court can frequently get great assistance from the interpreting statements made by the parties themselves or from their conduct in rendering or in receiving performance under it," as this is "further expression by the parties of the meaning that they give and have given to the terms of their contract previously made." Bissonnette v. Wylie, 166 Vt. 364, 371-72, 693 A.2d 1050, 1055 (1997) (quoting 3 A. Corbin, Corbin on Contracts § 558, at 249, 251-53 (1960)). Plaintiffs lean heavily on a case that presents this scenario: After finding a contract ambiguous as to its intent to benefit the third-party plaintiffs, the court looked to a contracting party's representations to the plaintiffs and found those representations supported the interpretation that the contract was intended to benefit the plaintiffs. Bayerische Landesbank v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 56 (2d Cir. 2012). Because the terms of the MOUs are unambiguous, however, we will not resort to subsequent representations by defendants to understand what they mean.

¶ 69.    Moreover, plaintiffs cannot maintain a third-party-beneficiary claim against ACCD because the MOU does not create any obligations by ACCD which plaintiffs allege ACCD breached.    A third-party-beneficiary claim lies only against the breaching promisor.    See Restatement (Second) of Contracts § 304 ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty."    (Emphasis added)).    Even if plaintiffs were intended beneficiaries of the oversight obligations contained in the MOU, it was the Jay Peak Projects who promised in the MOU to provide quarterly reports and perform other oversight and accounting activities.  If plaintiffs were

31

intended beneficiaries of that promise, they would have a claim against the Jay Peak Projects for breach—but not ACCD.

¶ 70. We agree with plaintiffs that by participating in offering the MOUs to prospective investors, including plaintiffs, ACCD could have reinforced its claims directly to them that it would oversee the finances of the Jay Peak Projects, including by requiring and reviewing the materials the Jay Peak Projects were required to supply pursuant to those MOUs. But because the MOUs themselves impose few actual obligations on ACCD, and contain no indication that they intended plaintiffs to have the right to enforce any such obligations, we conclude that plaintiffs' direct contract claims provide the proper vehicle for developing plaintiffs' arguments in this regard.

V. Securities Fraud Against All Defendants (Count 2)

¶ 71. The trial court properly dismissed plaintiffs' claim of securities fraud under the Vermont Uniform Securities Act, 9 V.S.A. §§ 5501 and 5509, against all defendants. The claim falls squarely within an exception to the State's waiver of sovereign immunity through the Vermont Tort Claims Act, and as to the individual defendants, it was not pled with the particularity required for averments of fraud under Vermont Rule of Civil Procedure 9(b).

¶ 72. Under § 5501 of the Vermont Uniform Securities Act:

> It is unlawful for a person, in connection with the offer to sell, the offer to purchase, the sale, or the purchase of a security, directly or indirectly:
>
> (1) to employ a device, scheme, or artifice to defraud;
>
> (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

Section 5509(b) provides that:

> A person is liable to the purchaser if the person sells a security in violation of [Section 5501], the purchaser not knowing the untruth or omission or deceptive nature of the conduct and the seller not sustaining the burden of proof that the seller did not know and, in the exercise of reasonable care, could not have known of the untruth or omission or deceptive nature of the conduct.

¶ 73. Plaintiffs' complaint does not specify which statements or acts, by which defendants, they contend violate the Act. The complaint alleges that defendants "engaged in a common plan . . . pursuant to which they knowingly or recklessly engaged in acts . . . which operated as a fraud and deceit upon Plaintiffs, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements . . . not misleading," the purpose of all of which was to induce plaintiffs to invest in the Jay Peak Projects. On appeal, plaintiffs sharpen the focus of their claims somewhat by arguing defendants "schemed to defraud [plaintiffs] . . . by claiming superior oversight and monitoring of the Jay Peak Projects."

¶ 74. The plaintiffs' securities-fraud claim against ACCD is barred by sovereign immunity. The State's waiver of sovereign immunity in the Vermont Tort Claims Act expressly excludes "[a]ny claim arising out of . . . misrepresentation, deceit, fraud, or interference with contractual rights." 12 V.S.A. § 5601(e)(6). The gravamen of plaintiffs' securities-fraud claim is that ACCD made misrepresentations, acted with deceit, and engaged in fraud. The State has not waived its sovereign immunity with respect to such claims, and the trial court properly dismissed the securities-fraud count against ACCD.

¶ 75. With respect to the individual defendants, plaintiffs have not pled fraud with sufficient particularity to survive a motion to dismiss. Because plaintiffs characterize this claim as one for fraud, the pleadings must meet the requirements of Vermont Rule of Civil Procedure 9(b). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." V.R.C.P. 9(b). "[O]ne of the primary

objectives of Rule 9(b) is to provide the defendant with sufficient information to enable [them] to effectively prepare a response." Silva v. Stevens, 156 Vt. 94, 106, 589 A.2d 852, 859 (1991). It is insufficient to broadly allege that "the defendants" made fraudulent or deceitful statements to induce plaintiffs to invest. Rule 9(b) requires that plaintiffs identify the particular statements or acts by particular defendants that they claim were fraudulent. See Eaves v. Designs for Fin., Inc., 785 F. Supp. 2d 229, 247 (S.D.N.Y. 2011) (explaining that a plaintiff "may not lump separate defendants together in vague and collective fraud allegations" but must with particularity describe the nature of each defendant's "alleged participation in the fraud" (quotation omitted)). Plaintiffs have failed to plead fraud against any individual defendants with sufficient particularity. Because we affirm the trial court's dismissal of the securities-fraud count on the above bases, we need not address the statute-of-limitations defense the State has raised.

## VI. Remaining Claims[11]

¶ 76. Finally, plaintiffs state in passing that the court erred in dismissing their claim of breach of fiduciary duty against all defendants (Count 7), aiding and abetting breach of fiduciary duty against all defendants (Count 9), and breach of implied contract against all defendants (Count 13), but they offer no argument as to the specific claims. Instead, in their briefing, they lump the breach-of-fiduciary-duty claims together in a category of "[n]egligence-[r]elated [c]laims" and the implied-contract claim into a category of "contract claims." The State likewise lumps these claims into broader categories, and has not offered specific arguments for dismissal of these particular claims other than asserting that plaintiffs have waived these claims, either by conceding them below or by failing to brief them in their principal brief.

¶ 77. Plaintiffs lump their breach-of-fiduciary-duty claims together with their negligence claims, but the claims are distinct from ordinary negligence claims and rest on different elements

---

[11] On appeal, plaintiffs do not purport to challenge the trial court's dismissal of Counts 1 (fraud against all defendants), 10 (aiding and abetting fraud against all defendants), and 12 (consumer fraud against all defendants). We accordingly do not address the trial court's dismissal of those claims.

of proof. See Restatement (Second) Torts § 874 ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation."); id. cmt a ("A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."). Consistent with our general policy of not addressing claims on appeal that are not briefed, we do not address these claims. See In re Dunnett, 172 Vt. 196, 203, 776 A.2d 406, 412 (2001); Bishop v. Town of Barre, 140 Vt. 564, 579, 442 A.2d 50, 57 (1982) ("This Court will not search the record for errors inadequately briefed.").

¶ 78. Likewise, plaintiffs claim that their arguments in support of their breach-of-contract, breach-of-implied-covenant-of-good-faith-and-fair-dealing, and third-party-beneficiary claims support their implied-contract claim, but this misunderstands the fundamentally different nature of implied contracts. The implied-contract doctrine provides an equitable remedy "based on an implied promise to pay when a party receives a benefit and the retention of the benefit would be inequitable. Liability in such cases arises from the doctrine of unjust enrichment." Sweet v. St. Pierre, 2018 VT 122, ¶ 18, __ Vt. __, 201 A.3d 978 (quotation omitted). An implied-contract claim is not a contract claim at all. There was thus no briefing on appeal specifically addressing the implied-contract claim. For the reasons noted above, we thus affirm the trial court's dismissal of the implied contract claim.

Affirmed, except that the dismissal of the following claims is reversed: negligence against ACCD; negligent misrepresentation against ACCD; gross negligence against defendants Brent Raymond and James Candido; and breach of contract and the implied covenant of good faith and fair dealing against ACCD. The matter is remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____

Associate Justice

35